2020 UT App 85

# THE UTAH COURT OF APPEALS

ROBERT BERGER, JACK BERGER, AND THE ESTATE OF BONNIE BERGER,
Appellants,
*v.*
OGDEN REGIONAL MEDICAL CENTER, MOUNTAINSTAR HEALTH
CARE, MOUNTAINSTAR CARDIOVASCULAR, JOSEPH GRAHAM,
DANIEL J. GREENBERG, AND D. SCOTT STANLEY,
Appellees.

Opinion
No. 20190206-CA
Filed June 4, 2020

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 140904377

Brett D. Cragun, Attorney for Appellants

Eric P. Schoonveld, and Justin W. Pendleton,
Attorneys for Appellees Ogden Regional Medical
Center, and Mountainstar Health Care

Christian W. Nelson, Brandon B. Hobbs, and Sean C.
Miller, Attorneys for Appellees Joseph Graham, and
Mountainstar Cardiovascular

Brian P. Miller, Christopher W. Droubay, and
Nathanael J. Mitchell, Attorneys for Appellees Daniel
J. Greenberg and D. Scott Stanley

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1     In this medical malpractice case, Robert Berger, Jack
Berger, and the Estate of Bonnie Berger (collectively, the Bergers)
appeal the district court's summary judgment in favor of Ogden

Regional Medical Center, Mountainstar Health Care, Mountainstar Cardiovascular, Joseph Graham, Daniel J. Greenberg, and D. Scott Stanley (collectively, Defendants). The Bergers contend that the district court erred in rejecting their effort to rely on the doctrine of res ipsa loquitur, in denying their request to extend the expert discovery deadlines, and in granting summary judgment to Defendants on the ground that they had not designated any expert witnesses and thus could not establish their medical malpractice claim. We affirm.

BACKGROUND[1]

¶2　On May 31, 2011, Bonnie Berger underwent robotic lung surgery at Ogden Regional Medical Center under Defendants' care. The purpose of the surgery was to evaluate her for non-small cell carcinoma and to remove the lower lobe of one lung. During the surgery, Bonnie[2] developed possible arterial bleeding, became hypotensive, and suffered an anoxic brain injury. She emerged from surgery unresponsive and died a week later.

¶3　The Bergers filed a medical malpractice lawsuit against Defendants in 2014. In their complaint, the Bergers alleged that Defendants had deviated from the standard of care in the following ways:

---

1. When reviewing the grant of summary judgment, "this court views the facts in a light most favorable to the losing part[ies] below"—here, the Bergers. *See Goodnow v. Sullivan*, 2002 UT 21, ¶ 7, 44 P.3d 704 (cleaned up).

2. Where relevant individuals share the same last name, we refer to them by their first names, with no disrespect intended by the apparent informality.

a. Improper preparation took place prior to surgery;

b. Surgical and anesthetic management were not properly attentive and responsive to changes in [Bonnie's] hemodynamic status;

c. The resuscitation efforts were not timely given the significant loss of blood volume from the bleeding artery, there was a lack of readily available replacement blood, and there was not proper intravenous access to reestablish the patient's blood volume.

d. There is [a] question regarding the continuity of care regarding whether the primary anesthesia provider was present in the operating room at the time [Bonnie] began to decline and/or whether there was proper transfer of care of the patient from the primary anesthesia provider to his replacement; and

e. Other deficiencies which may be noted after proper discovery.

¶4 Over the course of the next three years, the parties stipulated to extending the discovery deadlines seven times, which the district court allowed in each instance. Fact discovery finally closed on February 22, 2018. The Bergers' deadline to disclose the identity of any expert witnesses was one week later, on March 1, 2018.

¶5 The day before the deadline, the Bergers moved for more time to disclose their expert witnesses. In support of their motion, the Bergers asserted that, as a result of fact discovery, they "believe[d] the injury sustained by Bonnie Berger . . . was of a type that did not occur in the absence of negligence and

therefore expert testimony may not be necessary in this case under the doctrine of res ipsa loquitur." The Bergers stated their intention to file a separate motion asking the court to determine whether res ipsa loquitur applied to the facts of the case, and they urged the court to extend the expert deadlines "until the determination regarding the applicability of res ipsa loquitur is reached." If res ipsa loquitur applied, the Bergers asserted, the parties could "avoid the time and expense" of unnecessary discovery. On the other hand, if res ipsa loquitur did not apply, the parties could "proceed with expert discovery in the normal course."

¶6     On March 7, 2018, the Bergers filed a motion asking the court to determine whether there was adequate foundation for a jury instruction on the doctrine of res ipsa loquitur. *See generally* Model Utah Jury Instructions 2d CV327 (2018). In so doing, the Bergers moved from the specific theories set out in their complaint to a much more generalized theory premised on the doctrine. According to the Bergers, res ipsa loquitur applied to the facts of the case because Bonnie's injury "was of a kind which in the ordinary course of events, would not have happened had [Defendants] used due care," and the jury therefore could infer Defendants' fault without the need for expert testimony. The Bergers argued that "it is within the knowledge and experience of laypersons that a person with a healthy brain does not usually go into the operating room for lung surgery and emerge with a brain injury without some occurrence of negligence." They further argued that "[t]here is no need for an expert to explain what is readily within the knowledge of laypersons" and that the burden should shift to Defendants to show that they were not negligent.

¶7     Defendants opposed the Bergers' request for a res ipsa loquitur jury instruction. Disagreeing with the Bergers' position that it would be common knowledge that Bonnie's injury would not have occurred absent negligence, Defendants asserted that

"[n]one of the issues in this case are within the common knowledge of lay jurors," including "non-small cell carcinoma, robotic surgery, anesthesia techniques, and hospital blood procedures and administration." As a result, Defendants asserted, res ipsa loquitur had no application to the case and the Bergers were subject to the general rule that expert testimony is required to establish a medical malpractice claim. In the meantime, Defendants disclosed their own experts.

¶8 Defendants also opposed the Bergers' motion to extend the expert discovery deadlines, arguing that no good cause existed to justify an extension. Defendants asserted that the Bergers had known the facts underlying the motion "for months, if not years," and that the Bergers "should have either designated experts or simply expressed their intention to rely on the doctrine of res ipsa loquitur." Noting that "designating experts would not necessarily preclude them from relying on the doctrine," Defendants characterized the Bergers' motion as an attempt to have the court "decide for them if they should designate experts" and asserted that the Bergers "should not get an extension just in case they are wrong" about the applicability of res ipsa loquitur.

¶9 After hearing oral argument on the issue of res ipsa loquitur, the district court denied the Bergers' motion for a jury instruction on the doctrine. The court agreed with Defendants, ruling that "this is not the type of case where a layman could determine whether the event causing the damage is of a type that ordinarily would not happen except for someone's negligence" and that the doctrine of res ipsa loquitur therefore was inapplicable. (Cleaned up.)

¶10 Thereafter, Defendants moved for summary judgment, asserting they were entitled to judgment as a matter of law. They argued that because the Bergers had not timely disclosed any experts, the Bergers would be unable to meet their burden at

trial to establish, by expert testimony, the elements of their claim, including the applicable standard of care, a breach of that standard, and causation.

¶11    In opposing Defendants' motion, the Bergers countered that they had timely moved to extend the discovery deadlines before their expert designations were due and that their motion remained pending. The Bergers also explained that, while not seeking to delay the case, they had pursued their res ipsa loquitur theory to see if it could "eliminate or refine the need for expert discovery . . . and potentially expedite the disposition" of the case. They further argued that Defendants had not been harmed by, and the Bergers had not gained advantage from, the fact that Defendants were the first to designate expert witnesses. The Bergers also maintained that good cause existed to extend the expert discovery deadlines. Yet they conceded that if the court did not allow them additional time to designate expert witnesses, they would be without expert testimony and Defendants would be entitled to summary judgment.

¶12    The court heard oral argument on the pending motions and entered rulings. First, it denied the Bergers' motion to extend the discovery deadlines, explaining that rule 26 of the Utah Rules of Civil Procedure requires that "if a party fails to designate a witness by the appropriate deadline, that party may not be permitted to use that witness at trial." The court then found that the Bergers' undisputed failure to designate experts by the March 1, 2018 deadline was "not harmless because it precipitated Defendants disclosing their expert information out of sequence, and without the benefit of the information to which they are entitled under Rule 26(a)(4)(C)." It also found that the Bergers' failure to disclose experts "was not the result of good cause." According to the court, the Bergers "had every opportunity to designate their experts and they simply failed to do so." Bonnie's surgery "happened seven years" before, the lawsuit itself had been "pending for over four years," and there

had been "a number of extensions for discovery deadlines." Although the Bergers elected to proceed under a res ipsa loquitur theory of liability, the court reasoned that their "decision to proceed in such a manner did not obviate the requirement to designate expert witnesses by the appointed deadline." Under these circumstances, the court decided that rule 26 "mandate[d] the exclusion of [the Bergers'] experts at this point in the case."

¶13 The court then granted Defendants' motion for summary judgment. It explained that because it had previously ruled that res ipsa loquitur was inapplicable, the Bergers "must present their case to the jury via qualified medical experts to opine on the applicable standard of care, a breach of that standard and causation." Because the Bergers could not "present any disputed issue of material fact as to any element of their prima facie case in the absence of expert testimony," Defendants were entitled to summary judgment. The Bergers appeal.

ISSUES AND STANDARDS OF REVIEW

¶14 The Bergers advance three issues on appeal. First, they contend that the district court erred when it ruled that they failed to establish a prima facie case of res ipsa loquitur and declined to instruct the jury on the doctrine. "[W]hether a plaintiff has established the requisite foundation for a res ipsa loquitur instruction is a question of law." *Walker v. Parish Chem. Co.*, 914 P.2d 1157, 1161 (Utah Ct. App. 1996). We review a district court's resolution of a question of law for correctness. *See Pilot v. Hill*, 2019 UT 10, ¶ 9, 437 P.3d 362.

¶15 Second, the Bergers contend that the district court erred in denying their motion to extend the expert discovery deadlines. "Trial courts have broad discretion in managing the cases before them and we will not interfere with their decisions absent an abuse of discretion. When reviewing a district court's exercise of

discretion, we will reverse only if there is no reasonable basis for the district court's decision." *Callister v. Snowbird Corp.*, 2014 UT App 243, ¶ 9, 337 P.3d 1044 (cleaned up).

¶16    Third, the Bergers contend that the district court erred in granting summary judgment to Defendants. Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We review the district court's decision to grant summary judgment for correctness. *Ruiz v. Killebrew*, 2020 UT 6, ¶ 7, 459 P.3d 1005.

ANALYSIS

I. Res Ipsa Loquitur

¶17    The Bergers contend that the district court erred when it ruled that they "did not establish a prima facie case for res ipsa loquitur and further erred when it failed to approve the proposed jury instruction." The Bergers' contention hinges on their assertion that Bonnie's injury "was of a kind that, in the ordinary course of events, would not have happened if due care had been observed." This assertion, in turn, rests on the premise that "it is within the knowledge and experience of laypersons that a person with a healthy brain does not *usually* go into the operating room for routine lung surgery and emerge with a brain injury that causes death without some occurrence of negligence." For the reasons below, we reject the Bergers' position and conclude that the district court correctly ruled that res ipsa loquitur is inapplicable to this case.

¶18    To prevail on a claim of medical malpractice, "a plaintiff must prove four elements: (1) the standard of care required of health care providers under the circumstances; (2) breach of that standard by the defendant; (3) injury proximately

caused by the breach; and (4) damages." *Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, ¶ 8, 263 P.3d 405. "To establish the standard of care required of a physician in a particular field, breach of that standard, and proximate cause, the plaintiff is generally required to produce an expert witness who is acquainted with the standards of care in the same or a similar field as the defendant doctor." *Dalley v. Utah Valley Reg'l Med. Center*, 791 P.2d 193, 195–96 (Utah 1990). The reason for this general rule is that "the nature of the [medical] profession removes the particularities of its practice from the knowledge and understanding of the average citizen." *Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980). The doctrine of res ipsa loquitur is an exception to this general rule. *Dalley*, 791 P.2d at 196.

¶19    Through the doctrine of res ipsa loquitur, a plaintiff may establish "a prima facie case of negligence using circumstantial evidence." *Id.* When the doctrine comes into play, it is often because "a plaintiff may be unconscious or incapacitated during surgery, and therefore unable to identify a defendant's specific negligent acts." *Baczuk v. Salt Lake Reg'l Med. Center*, 2000 UT App 225, ¶ 6, 8 P.3d 1037. Res ipsa loquitur thus "allows an inference of negligence to be drawn when human experience provides a reasonable basis for concluding that an injury probably would not have happened if due care had been exercised." *King v. Searle Pharm., Inc.*, 832 P.2d 858, 861 (Utah 1992). This inference of negligence is "rebuttable," putting "the burden of going forward with the evidence" on the defendants. *Dalley*, 791 P.2d at 200. And "[s]ince res ipsa loquitur generally raises only an inference and not a presumption of negligence, the fact finder may choose either to accept or reject that inference." *King*, 832 P.2d at 861.

¶20    To rely on the doctrine of res ipsa loquitur, a "plaintiff must establish an evidentiary foundation from which a finder of fact could logically conclude that an injury was probably caused

by negligence." *Baczuk*, 2000 UT App 225, ¶ 6. A plaintiff does so by showing three elements:

> (1) The accident was of a kind which, in the ordinary course of events, would not have happened had the defendant[s] used due care, (2) the instrument or thing causing the injury was at the time of the accident under the management and control of the defendant[s], and (3) the accident happened irrespective of any participation at the time by the plaintiff.

*Nixdorf*, 612 P.2d at 352–53 (cleaned up). Only the first element is disputed on appeal.

¶21 Establishing an evidentiary foundation that a plaintiff's injury "was of a kind which, in the ordinary course of events, would not have happened had the defendant[s] used due care" "presents a peculiar problem to a plaintiff in a medical malpractice case because of the necessity of showing what the usual outcome of a medical procedure would be when the required due care is employed." *Id.* (cleaned up). A plaintiff may take one of two paths for laying the required evidentiary foundation. One path is for the plaintiff to introduce "expert medical testimony to establish the fact the outcome is more likely the result of negligence than some other cause." *Id.* at 353; *see also King*, 832 P.2d at 862; *Baczuk*, 2000 UT App 225, ¶ 7. The other path is for the plaintiff to "rely on the common knowledge and understanding" of laypersons. *Nixdorf*, 612 P.2d at 353; *see also King*, 832 P.2d at 862–63. This is because the Utah Supreme Court has recognized that "in certain situations, the medical procedure is so common or the outcome so affronts our notions of medical propriety that expert testimony is not required to establish what would occur in the ordinary course of events." *Nixdorf*, 612 P.2d at 353. "A classic example" of this type of situation is "leaving a foreign object in a patient's body during

surgery." *King*, 832 P.2d at 862; *accord Pete v. Youngblood*, 2006 UT App 303, ¶¶ 23–24, 30, 141 P.3d 629.[3]

¶22    Here, because the Bergers maintain "there is no need for an expert to explain what is readily within the knowledge of laypersons," they thus are relying on the "common knowledge" path for establishing that Bonnie's injury "was of a kind which, in the ordinary course of events," would not have happened but for Defendants' negligence. *See Nixdorf*, 612 P.2d at 352–53 (cleaned up). The Bergers' theory is as follows: "[Bonnie's] brain was injured during lung surgery. She died from that injury. This is not a common occurrence. As such, it is reasonable to infer that negligence occurred (subject to [Defendants] being given the opportunity to prove otherwise)." In so arguing, the Bergers liken this case to two cases in which res ipsa loquitur applied to surgical patients who suffered injuries to unrelated parts of their bodies.

¶23    First, in *Dalley v. Utah Valley Regional Medical Center*, 791 P.2d 193 (Utah 1990), the plaintiff underwent a caesarean section and returned from the operating room with a burn on the calf of her right leg. *Id.* at 195. The Utah Supreme Court held that "it is within the knowledge and experience of laypersons that a woman with a healthy leg does not usually go into an operating room for a caesarean section operation and emerge with a burn on her leg without some occurrence of negligence." *Id.* at 196. Concluding that "[t]his type of inference does not require expert testimony concerning the standard of care and breach of that

---

3. Other examples in non-medical contexts include "a barrel of flour falling from a warehouse window onto a pedestrian," "a falling elevator," a "sudden slamming of automatic doors in an airport," and "glass particles found in a loaf of bread." *Walker v. Parish Chem. Co.*, 914 P.2d 1157, 1162 (Utah Ct. App. 1996) (collecting cases).

standard," *id.*, the court further explained that when "a plaintiff receives an injury to a healthy part of the body not involved in the operation in an operating room controlled by known defendants, res ipsa loquitur establishes a rebuttable inference of negligence and causation that puts the burden of going forward with the evidence upon [the defendants]," *id.* at 200.

¶24    Second, in *Baczuk v. Salt Lake Regional Medical Center*, 2000 UT App 225, 8 P.3d 1037, the plaintiff underwent hand surgery. *Id.* ¶ 2. An anesthesiologist "had used a heating pad to prevent vasoconstriction during the surgery," and after surgery, the plaintiff discovered "a pressure injury and/or a burn to his buttocks." *Id.* On appeal, this court agreed with the plaintiff that "it is within the understanding of laypersons that his burn and/or pressure injury on an originally uninjured part of his body not involved in the surgery more probably than not resulted from negligence." *Id.* ¶ 8. This court reasoned, "It requires no medical or technical expertise to understand that a person may suffer a burn and/or a pressure injury from lying in the same position for too long on a heating pad. Nor does it require medical expertise to understand the steps that must be taken to avoid such injuries." *Id.* ¶ 11. Accordingly, this court concluded that the plaintiff was "justified in relying on the understanding of laypersons" to set forth the evidentiary foundation for res ipsa loquitur. *Id.* ¶¶ 7–8, 11.

¶25    Relying on *Dalley* and *Baczuk*, the Bergers argue that "it would also appear that it is within the knowledge and experience of laypersons that a person with a healthy brain does not *usually* go into the operating room for routine lung surgery and emerge with a brain injury that causes death without some occurrence of negligence." We disagree.

¶26    This case is dissimilar to *Dalley* and *Baczuk*. *Dalley* turned on the existence of a simple injury (a burn on the leg) that would clearly not occur during the specific type of procedure (a

caesarean section), *see Dalley*, 791 P.2d at 196, 200, and *Baczuk* turned primarily on the simplicity of the injury (burn and/or pressure injury on the buttocks) and its lack of connection to the procedure (hand surgery), *see Baczuk*, 2000 UT App 225, ¶¶ 7–8, 11. In contrast, this case presents more complex questions about the procedure and injury that non-medically trained persons would be unable to evaluate without assistance. Laypersons would be unable to assess whether an anoxic brain injury clearly would not occur during a robotic lung surgery and whether that injury had any connection to the procedure. Indeed, whether and how an anoxic brain injury could occur during a robotic procedure on a patient's lung do not fall within the common understanding of laypersons. This injury is not an obvious one that a non-medically trained person could automatically associate with negligence, like "leaving a foreign object in a patient's body during surgery." *See King*, 832 P.2d at 862. Moreover, laypersons likely do not understand "the steps that must be taken to avoid" injuries like Bonnie's. *See Baczuk*, 2000 UT App 225, ¶ 11.

¶27 Although the Bergers claim that, like *Dalley* and *Baczuk*, this case involves an injury to an otherwise healthy part of the body that is uninvolved with the procedure, we cannot agree. Defendants point out—and the Bergers do not dispute—that a procedure removing the lower lobe of a lung necessarily involves the respiratory and circulatory systems, which supply oxygen to the brain, and that, as a matter of biology, the proper functioning of the lungs is crucial to the health of the brain. Thus, unlike the procedures and sites of injury in *Dalley* and *Baczuk*, the brain is not a remote, uninvolved part of the body when a patient is undergoing lung surgery.

¶28 We thus agree with the district court that this is "a medically complicated malpractice case" and that the issues "are not within the common knowledge of lay jurors." The medical and standard of care questions are complex and involve a

number of subjects "with which a lay juror would have no familiarity or expertise," including "non-small cell carcinoma, robotic surgery, anesthesia techniques, and hospital blood procedures and administration." We agree that it is not within the common understanding of laypersons to determine "whether a surgeon correctly performed the robotic evaluation and removal of non-small cell carcinoma," whether "anesthesia techniques used during the surgery were appropriate and within the standard of care," and whether a patient was adequately and appropriately "monitored during a procedure." It is also not within the common understanding of laypersons to evaluate "hospital policies regarding availability of blood product in procedures such as this, including blood bank procedures and the use of a cell saver machine."

¶29    In short, the district court correctly ruled that "this is not the type of case where a layman could determine whether the event causing the damage is of a type that ordinarily would not happen except for someone's negligence." (Cleaned up.) The situation surrounding Bonnie's injury is not one in which the Bergers "can rely on the common knowledge and understanding of laymen to establish" that Bonnie's injury was probably caused by negligence. *See Nixdorf*, 612 P.2d at 353. Therefore, the Bergers cannot rely on the doctrine of res ipsa loquitur to exempt them from the general rule that expert testimony is required to support their medical malpractice claim.[4] Accordingly, we affirm the district court's ruling on the issue of res ipsa loquitur.

---

4. In arguing that they should have been able to rely on res ipsa loquitur without expert testimony, the Bergers emphasize that evidence was conflicting at the end of fact discovery, "there were still questions about what actually caused [Bonnie's] injury," and those facts "are only known by [Defendants]." Because of these circumstances, the Bergers suggest that their potential experts

(continued…)

## II. Expert Disclosure Deadlines

¶30 Next, the Bergers contend that the district court erred in denying their motion to extend the expert discovery deadlines. They assert that their motion was justified by good cause because, as a matter of "fairness, a plaintiff should be able to obtain a ruling on invocation of the doctrine of res ipsa loquitur before expert discovery is required." According to the Bergers, the doctrine of res ipsa loquitur "cannot be effectively invoked before the close of fact discovery (because facts may be learned which make the doctrine inappropriate) and logically should be invoked before expert discovery begins (to allow expert discovery to proceed effectively)." They also assert that extending the discovery deadlines would have "maintain[ed] the status quo," resulted in only a "short delay," and caused no prejudice to any party.

¶31 District courts generally may extend deadlines "for good cause."[5] Utah R. Civ. P. 6(b)(1). In exercising its discretion to

---

(…continued)

"would only be able to speculate and infer what happened to [Bonnie]" and therefore "it is only reasonable that [Defendants] be required to explain how [Bonnie's] injury occurred in a non-negligent way." We are not persuaded. Instead, we agree with Defendants that "experts reach opinions based on conflicting facts as a matter of course" and that, specific to this case, "the possibility of conflicting opinions supports the argument that the procedure and injuries in this case could be explained by multiple potential causes," underscoring the extent to which "the medical issues fall outside the realm of common knowledge or experience."

5. In their opening brief, the Bergers claim that the district court "applied the wrong standards in denying the motion to extend

(continued…)

deny the Bergers' motion to extend the discovery deadlines, the district court articulated reasonable bases to support its decision that the Bergers' failure to disclose experts "was not the result of good cause." The court determined that the Bergers "had every opportunity to designate their experts and they simply failed to do so." *See Townhomes at Pointe Meadows Owners Ass'n v. Pointe Meadows Townhomes, LLC*, 2014 UT App 52, ¶ 12, 329 P.3d 815 (affirming the denial of a motion to extend the discovery deadlines when the district court determined, among other things, that "the discovery period in [the] case ha[d] afforded the parties a fair and reasonable opportunity to prepare for trial" (cleaned up)), *superseded on other grounds by rule as stated in Ghidotti v. Waldron*, 2019 UT App 67, 442 P.3d 1237. Indeed, the events in question "happened seven years" earlier, the parties had been litigating "for over four years," and there had already been "a number of extensions for discovery deadlines." Additionally, the court determined that the Bergers' undisputed failure to designate experts by the March 1, 2018 deadline was "not harmless" given that it forced Defendants to make their expert disclosures "out of sequence" and "without the benefit of" the Bergers' expert disclosures.

¶32 Likewise, the district court rejected the notion that the Bergers' motion on their res ipsa loquitur theory provided good cause for extending the disclosure deadlines. The court reasoned that the "decision to proceed in such a manner did not obviate the requirement to designate expert witnesses by the appointed deadline." It explained that while the Bergers could have avoided calling an expert at trial if they had prevailed on

---

(…continued)

expert discovery deadlines." But in oral argument before this court, the Bergers conceded that the district court applied the correct standard in deciding the motion.

the res ipsa loquitur motion, they could have "at least designated an expert to comply with the discovery rules," especially when medical malpractice cases commonly "end up being a battle of experts." But where the Bergers "roll[ed] the dice and wait[ed] to see" whether they prevailed on their res ipsa loquitur motion before designating experts, the court did not see "any wiggle room" to "give [them] more time to come up with an expert."

¶33 We appreciate the Bergers' perceived dilemma concerning their attempt to rely on res ipsa loquitur and their impending expert disclosure deadlines. These considerations might have weighed in favor of extending the deadlines in this case and might have provided a reasonable basis for doing so. Yet the district court's decision on the matter was "a discretionary call," reviewed only for abuse of discretion. *See Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶ 24, 361 P.3d 703 (Orme, J., concurring) (opining that the district court "made the wrong call" on a motion to change venue but that "it was, in its essence, a discretionary call—and one that was within the broad range of discretion entrusted to [it]"). While we cannot say that we necessarily would have denied the Bergers' motion had we been in the district court judge's position considering it in the first instance, we affirm the district court's decision under the deferential standard of review that we are obliged to apply. *See id.* ¶ 21 (emphasizing that "standards of review really do matter"). Under that standard, "we will reverse only if there is no reasonable basis for the district court's decision." *See Townhomes*, 2014 UT App 52, ¶ 9. Here, the district court articulated reasonable bases for its decision, including that the case had been pending "for over four years" and the Bergers "had every opportunity to designate their experts." We thus conclude that the district court did not exceed the bounds of its discretion when it denied the Bergers' motion to extend the expert discovery deadlines.

### III. Summary Judgment

¶34 Finally, the Bergers challenge the district court's grant of summary judgment to Defendants, making their challenge contingent on their success on the first issue raised on appeal. They assert that "if this court determines that the Bergers have established the requisite foundation to invoke the doctrine of res ipsa loquitur then the trial court's determination that summary judgment for lack of designation of an expert should be reversed."

¶35 As discussed, a plaintiff must prove four elements to prevail on a medical malpractice claim. *Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, ¶ 8, 263 P.3d 405. "A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the elements of the prima facie case justifies a grant of summary judgment to the defendant." *Id.* (cleaned up). In light of our affirmance of the district court's decision that the res ipsa loquitur theory is unavailable to the Bergers, and in light of our affirmance of its decision denying the Bergers further opportunity to designate expert witnesses, we also affirm the district court's decision granting summary judgment to Defendants.

### CONCLUSION

¶36 We conclude that the district court correctly determined that the Bergers could not rely on the doctrine of res ipsa loquitur. We also conclude that the court did not exceed its discretion in denying the Bergers' motion to extend the expert discovery deadlines. Given the Bergers' need for expert testimony and their failure to designate any expert witnesses, the district court correctly granted summary judgment in favor of Defendants. Accordingly, we affirm the district court in all respects.

————————